UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

| | |
|---|---|
| REBELS, LLC, <br><br> Plaintiff, <br><br> vs. <br><br><br> LYNETTE CHANG, a/k/a Lynette McQuade; THOMAS WIEST, <br><br> Defendants. | 1:24-CV-01024-ECS <br><br><br><br> ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS |

This matter comes before the Court on Defendant Thomas Wiest's Motion for Judgment on the Pleadings, pursuant to Federal Rule of Civil Procedure 12(c). Doc. 23. Plaintiff Rebels, LLC brings a claim of aiding and abetting deceit by intentional misrepresentation against Wiest for his part in alleged bad acts surrounding a land deal. See generally Doc. 17. Wiest argues he is entitled to judgment as a matter of law because (1) Rebels fails to plausibly state a claim for the underlying deceit, and (2) South Dakota does not recognize the tort of aiding and abetting. See generally Doc. 24.

I.      **Factual Background**[1]

The Karen Ann Chang Family Trust (the Trust) owned real property (the Property) in Brown County, South Dakota. Doc. 17 ¶¶ 1, 5. Shortly after purchasing it, the Trust leased the

---

[1] On a defendant's motion for judgment on the pleadings, all factual allegations in the complaint are accepted as true. DeGeer v. Union Pac. R.R. Co., 113 F.4th 1035, 1039 (8th Cir. 2024) (citing Ellis v. City of Minneapolis, 860

Property to Joseph Berbos and his brother to farm. Id. ¶ 6. Berbos retired from farming in 2018, and Chris and Jason Sylte agreed to lease the Property. Id. ¶ 7. The Syltes and Joe Chang signed a lease for the Property on October 24, 2018, and the Syltes have continued to farm it since. Id. ¶ 8.

In the Fall of 2023, Laura von Roenn, the trustee of the Trust, contacted the Syltes to gauge their interest in purchasing the Property. Id. ¶¶ 2, 4, 9. In the spring of 2024, von Roenn again contacted the Syltes regarding their interest in purchasing the Property. Id. ¶ 10. The Syltes offered to purchase the Property under the terms of a contract for deed and sent their proposal to von Roenn. Id. ¶ 11. Shortly thereafter, the Syltes, Berbos, and Berbos' attorney were individually contacted by von Roenn, or the attorney representing von Roenn and the Trust, to discuss sale terms for the purchase of the Property. Id. ¶ 12. The Syltes and Berbos have worked closely together for a number of years and agreed to collaborate on the purchase of the Property. Id. ¶ 13. Together, they formed Rebels, LLC to proceed with the purchase. Id.

Unsolicited, the Trust's attorney sent an appraisal of the Property to Berbos' attorney; the appraisal indicated the Property's value was a little less than $3,000,000. Id. ¶ 14. The appraisal was subsequently forwarded to the Syltes and Berbos. Id. It was the Syltes' and Berbos' understanding that von Roenn was offering to sell the Property for the appraised value. Id. ¶ 15. Given this, Berbos' attorney prepared a purchase agreement reflecting the appraised amount. Id. The Syltes signed the purchase agreement and sent it to the Trust's attorney. Id. ¶ 16.

After several days of not receiving a return communication, Berbos' attorney contacted the Trust's attorney asking when von Roenn would execute the purchase agreement. Id. ¶ 17. A

---

F.3d 1106, 1109 (8th Cir. 2017)). Quotation marks are omitted where the Court quotes facts from Rebels' Amended Complaint, Doc. 17.

short while later, the Syltes and Berbos became aware that Thomas Wiest, significant other of Trust beneficiary Lynette Chang, was soliciting bids from other landowners to purchase the Property. Id. ¶¶ 2–3, 18. Rebels' attorney, Rodrick Tobin, contacted the Trust's attorney to determine the Trust's intent regarding the Property. Id. ¶ 19. The Trust's attorney informed Tobin of Wiest's involvement but stated he did not represent Wiest. Id.

Not long after the conversation between Tobin and the Trust's attorney, Wiest contacted Tobin explaining his plan to solicit offers from other landowners and have them bid against each other. Id. ¶ 20. Wiest provided Tobin with a letter from another landowner offering $3,125,000 for the Property. Id. ¶ 21. Tobin explained to Wiest that Rebels would not engage in a bidding war. Id. ¶ 22. To resolve the matter, Tobin communicated with Wiest and agreed to prepare a purchase agreement (Purchase Agreement) with the purchase price left blank. Id. ¶ 23. The trustee could then write in the purchase price that she agreed would end any further solicitation or acceptance of alternative bids. Id. The trustee would then sign the Purchase Agreement and return it to Tobin. Id. Once received, Rebels would review it, and if it agreed with the price, sign it. Id. Wiest agreed to Tobin's proposed procedure and Tobin sent Wiest the Purchase Agreement. Id. ¶ 24.

Paragraph 6.a. of the Purchase Agreement contains the seller's representations and warranties and subparagraph "i" states, "**Authority**. The persons signing this Agreement on behalf of Chang Estate and Change (sic) Trust has the requisite capacity and authority to do so." Id. ¶ 25.

On August 1, 2024, Lynette Chang or Wiest wrote "3,600,000" in the purchase price blank, and Lynette signed the Purchase Agreement. Id. ¶ 26. Under her signature, Lynette wrote, "I'm one of the Chang siblings. Tom is my husband who has been doing the negotiating. I'm

3

authorized to sign for the final accepted offer. Laura will sign the final official papers. We let Tom negotiate on behalf of us four. Thank you!" Id. (emphasis removed).

On Friday, August 2, 2024, Rebels signed the Purchase Agreement, and Tobin emailed Wiest the fully executed copy, which including the following message: "I understand that the person who signed on behalf of the Chang Trust was authorized by the Trustee to do so; however, I would appreciate Laura signing the PA as well." Id. ¶ 27 (emphasis removed).

On Saturday, August 3, 2024, Wiest received an offer from another buyer named Bill Edwards to purchase the Property for $3,500,000. Id. ¶ 28. On Monday, August 5, 2024, at 8:33 A.M., Wiest told Edwards that his $3,500,000 offer was the "top so far." Id. ¶ 29.

By Monday, August 5, 2024, at 10:46 A.M., Wiest had sent the Purchase Agreement to von Roenn for signature. Id. ¶ 30. In a text message to her on that date, Wiest stated, "Laura, I sent the purchase agreement to you to sign. Please do not send to anyone else, but me. I have a couple more angles in my back pocket to work through today." Id. ¶ 31 (emphasis removed).

Although Lynette represented that she had authority to "sign for the final accepted offer"—to sell the Property for $3,600,000 days earlier, on August 5, 2024, Wiest advised Edwards that Rebels had made a $3,600,000 "offer." Id. ¶ 32. On August 5, 2024, at 5:00 P.M., Edwards made an offer to purchase the Property for $3,700,000. Id. ¶ 33. After receiving Edwards' offer, Wiest called Tobin and indicated the Trust was offered $3,700,000 for the Property. Id. ¶ 34. Wiest asked Tobin what Tobin was going to do about it. Id. ¶ 35. Tobin informed Wiest that the Purchase Agreement was already signed. Id. ¶ 36. Wiest indicated that the Purchase Agreement, which he caused Lynette to sign, was not binding, and again asked: "What is Rebels going to do about the $3,700,000 offer?" Id. ¶ 37.

4

On August 6, 2024, Wiest emailed Tobin informing him the Chang family wanted "resolution" and requested Rebels' answer by noon. Id. ¶ 39. Tobin responded asking what exactly the Chang family wanted. Id. ¶ 40. Wiest replied, "$3.8 million and we are done because I am done [smiley face emoji]." Id. ¶ 41. Shortly after, Wiest sent another email stating, "[s]ince the deadline has expired we will extend until 7pm and then if nothing from you we will go with our other offer." Id. ¶ 42. Tobin requested additional time and Wiest responded, "[y]ou've known since yesterday we had an offer for $3.7 and you've had all day to at least make a phone call to your client. The 7pm deadline stands." Id. ¶ 43.

Tobin asked Wiest to send him the "PA" for $3,800,000 signed by von Roenn. Id. ¶ 44. On August 7, 2024, the Trust's attorney emailed Tobin a second purchase agreement in the amount of $3,800,000 signed by von Roenn. Id. ¶ 45. Chris Sylte signed the second purchase agreement on behalf of Rebels on the same date, and it was forwarded to the Trust's attorney. Id. ¶ 46.

Rebels brought the instant action on November 4, 2024. Doc. 1. In its Amended Complaint, Rebels brings one count of deceit by intentional misrepresentation against Lynette Chang and one count of aiding and abetting deceit by intentional misrepresentation against Thomas Wiest. Doc. 17 at 6. Wiest now moves for judgment on the pleadings. Doc. 23. The motion is fully briefed, and the Court heard oral argument in Aberdeen, South Dakota, on November 20, 2025.

## II. Discussion

### A. Standard for Judgment on the Pleadings

The distinction between judgment on the pleadings and a motion to dismiss is "purely formal"; both are analyzed under the same standard. Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990). "Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law." Ashley County v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009) (quoting Wishnatsky v. Rovner, 433 F.3d 608, 610 (8th Cir. 2006)). "When evaluating a motion for judgment on the pleadings, a court must accept as true all factual allegations set out in the complaint, and must construe the complaint in the light most favorable to the plaintiff, drawing all inferences in his favor." Wishnatsky, 433 F.3d at 610 (citing Waldron v. Boeing Co., 388 F.3d 591, 593 (8th Cir. 2004)). In this diversity case, the Court interprets South Dakota law "in determining whether the elements of the offenses have been pled." Ashley County, 552 F.3d at 665 (quoting Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc., 406 F.3d 1052, 1062 (8th Cir. 2005)).

### B. Whether South Dakota Recognizes an Aiding and Abetting Cause of Action

The Court first considers Wiest's argument that aiding and abetting is an "exclusively criminal concept," and that South Dakota does not recognize aiding and abetting deceit by intentional misrepresentation as a cause of action. Doc. 24 at 7. Rebels responds with ample authority to support the recognition of such a claim. Doc 26 at 7–9.

In Chem-Age Industries v. Glover, the South Dakota Supreme Court quoted Restatement (Second) of Torts § 876(b) for the proposition that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct

6

constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." 652 N.W.2d 756, 773 (S.D. 2002). That opinion further cited the comment on clause (b) of Section 876, which states "[a]dvice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." Id. at 774; Restatement (Second) of Torts § 876 cmt. b (A.L.I. 1979). Rebels proffers this case as evidence of its claim against Wiest. Doc. 26 at 7.

Wiest replies that Chem-Age "addressed aiding breach of fiduciary duty" but did not create "a standalone 'aiding and abetting' tort" or define the elements thereof. Doc. 28 at 7. The Court disagrees. In Gantvoort v. Ranschau, the court cited Chem-Age to recognize an aiding and abetting claim related to a different tortious act—invasion of privacy. 973 N.W.2d 225, 238–39 (S.D. 2022). It stated, "a fundamental requirement of establishing a claim for aiding and abetting is the existence of an underlying tort." Id. at 237. Those words support the conclusion that South Dakota would extend the aiding and abetting cause of action to any tort it recognizes. Specific to the alleged act here—deceit, Rebels quotes Tucek v. Mueller, where the court stated, "[e]very participant in a fraud and each one who assists another in the perpetration of the fraud is liable to the injured party." Doc. 26 at 7 (emphasis removed) (quoting 511 N.W.2d 832, 836 (S.D. 1994)). Wiest shrugs that statement off as "address[ing] assistance . . . under general tort principles." Doc. 28 at 7. But the South Dakota Supreme Court relied on general tort principles—the Restatement (Second) of Torts, when recognizing the claim of aiding and abetting in Chem-Age. That Rebels' claim also arises under general tort principles does not obviate its claim—it animates it.

7

## C. Whether Rebels Can Establish Fraud Damages

Even acknowledging aiding and abetting as a South Dakota cause of action, Wiest argues that Rebels cannot establish the underlying tort—deceit—because Rebels purchased the Property with knowledge of Chang's misrepresentation. Doc. 24 at 5–7.

In South Dakota, deceit is proven by showing:

> That a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with the intent to deceive and for the purpose of inducing the other to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage.

Grynberg v. Citation Oil & Gas Corp., 573 N.W.2d 493, 502 (S.D. 1997) (citation omitted).

South Dakota law does not distinguish between the "burden of proof applicable to cases of fraud and deceit." Rist v. Karlen, 241 N.W.2d 717, 720 (S.D. 1976). There is no cause of action for fraud (and therefore deceit) where there is no proof of damage. Olson v. Tri-Cnty. State Bank, 456 N.W.2d 132, 134 (S.D. 1990). And "there is no damage where the position of the complaining party is no worse that it would be had the alleged fraud not been committed." Id. (citation omitted).

South Dakota recognizes "a distinction between uncertainty as to the cause or fact of damages and uncertainty as to the amount of damages." Wang v. Bekken, 310 N.W.2d 166, 167 (S.D. 1981) (per curiam) (citation omitted). "Uncertainty as to the fact is fatal to recovery, but uncertainty as to the measure or extent of the damages does not bar recovery." Kowing v. Williams, 67 N.W.2d 780, 783 (S.D. 1954).

Wiest argues that when Rebels learned of Chang's misrepresentation, it could still walk away, so it "had suffered no financial harm when [the] truth was revealed." Doc. 24 at 5–7. And because Rebels purchased the Property after learning of Chang's misrepresentation, it cannot argue that it justifiably relied on Chang's misrepresentation when making the purchase. Id. at 6.

8

Wiest argues that the $200,000 difference between the first and second purchase agreement represents an "informed business decision." Id. at 7.

Rebels counters that "underlying Wiest's motion is the misconception that Rebels cannot establish fraud damages because it made an offer and bought the Property after it learned that Wiest and Chang lied." Doc. 26 at 5 (citation modified). Rebels states, "by that point in time, Rebels had already been induced to alter its position to its detriment by jumping from $3,000,000 to $3,600,000." Id. Rebels quotes Hoff v. Bower for the proposition that "[t]he damages which are recoverable" in an action for deceit "are those flowing from the changed condition of the parties induced or brought about by the deceit." Id. at 6 (quoting 492 N.W.2d 912, 914 (S.D. 1992)). Rebels argues that "it is not Rebels' burden to prove its loss in response to this motion; rather, Rebels gets the benefit of all reasonable inferences[, and] the Court can reasonably infer from the facts allege[d] that Rebels was damaged when Chang and Wiest deceived Rebels into offering an additional $600,000 for the [Property]." Id. (citation modified).

Wiest has the better argument. Because Rebels had not yet purchased the Property, its financial position was no different before or after it learned of Chang's misrepresentation. As a matter of law, then, Rebels incurred no damages. Olson, 456 N.W.2d at 134. At oral argument, Rebels defined the precise damages it intends to seek at trial. Rebels seeks the $200,000 difference between the first and second purchase agreements. But between the signing of those agreements, Rebels learned of Chang's dishonesty and was free to walk away. So, Rebels did not pay the $200,000 premium in reliance of Chang's misrepresentation. The willingness to pay more was motivated by Rebels' unflinching desire to purchase the Property in the face of Defendants' alleged trickery. Thus, Rebels cannot recover, as a matter of law, the $200,000 it intends to seek at trial.

Both reliance and damages are necessary elements to state a claim for deceit. Because Rebels fails to plead the underlying tortious act of deceit, there can be no liability for aiding and abetting deceit. Gantvoort, 973 N.W.2d at 237.

### III. Order

For the above reasons, and the record as it now exists before the Court, it is hereby

ORDERED that Wiest's Motion for Judgment on the Pleadings, Doc. 23, is granted. It is further

ORDERED that Count II of the Amended Complaint is dismissed without prejudice. Plaintiff may seek leave to amend its Complaint to assert viable claims against Wiest within 30 days. If leave to amend is not sought within this time, the dismissal will be with prejudice. The Court offers no opinion as to the viability of any claim. It is finally

ORDERED that the remaining parties shall submit a proposal to the Court for its consideration within 30 days on how best to address the remaining claim against Defendant Lynette Chang. Chang has not filed a dispositive motion seeking her dismissal, and the deadlines in the Court's current scheduling order, Doc. 10, have expired. The Court seeks counsel's input on how best to proceed.

DATED this 8th day of January, 2026.

BY THE COURT:

_____
ERIC C. SCHULTE
UNITED STATES DISTRICT JUDGE